14

U.S. Department of Justice

Office of Justice Programs

*Bureau of Justice Assistance*

*Washington, D.C. 20531*

FEB 28 2003

Patrick Ray Presley
[redacted]

Dear Mr. Presley:

A comprehensive review has been conducted regarding the claim for death benefits you filed with the Public Safety Officers' Benefits (PSOB) Office following the death of your father, Sheriff Harold Ray Presley. Unfortunately, based on this review, which included independent analyses of your claim by legal and medical experts, it has been determined that the claim had to be denied. While the PSOB Act (42 U.S.C. 3796) requires this determination, such action does not diminish Sheriff Presley's distinguished record of public service.

We have enclosed a copy of the official determination which specifies the legal basis for our denial of your claim. In addition, copies of the law governing the benefits program and the regulations which guide its application are enclosed for your information.

Section 32.24(a) of the PSOB implementing regulations (28 CFR 32) sets forth procedures for reconsideration of the enclosed determination. Should you choose this course of action, your request must be submitted within 30 days of receipt of this letter.

Our office works closely with Concerns of Police Survivors (COPS), a national grief-support organization for the families of law enforcement officers killed in the line-of-duty. Their brochure is enclosed.

We regret the loss of Sheriff Harold Ray Presley and extend our best wishes to you and your family.

If you need any assistance, please contact this office at (202) 307-0635 or 1-888-744-6513.

Sincerely,

Michael Guerriere
Chief
Payments and Benefits Division

Enclosures

cc: Jim Johnson

15

# PHELPS DUNBAR LLP

COUNSELORS AT LAW

Seventh Floor • One Mississippi Plaza
Tupelo, Mississippi 38804
P. O. Box 1220
Tupelo, Mississippi 38802-1220
(662) 842-7907
FAX: (662) 842-3873

## FACSIMILE COVER SHEET

March 28, 2003

TO: Loretta Behm OUR FILE: 17954.0001

Facsimile No.: 202-616-0314

Telephone No.:

FROM: Rachel M. Pierce

RE:

TOTAL PAGES (including this page): 2

MESSAGE:

CONFIDENTIALITY NOTICE

This facsimile transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents.

---

We are transmitting from a Canon Facsimile 7000

---

IF THERE IS ANY PROBLEM RECEIVING THIS MESSAGE,
PLEASE CALL (662) 842-7907 AND ASK FOR ALLYSON VAUGHTERS

CANON 7000 FACSIMILE - (662) 842-3873

PHELPS DUNBAR LLP
COUNSELORS AT LAW

New Orleans, LA
Baton Rouge, LA
Houston, TX
London, England

One Mississippi Plaza
201 South Spring Street · Seventh Floor
Tupelo, Mississippi 38804
P. O. Box 1220
Tupelo, Mississippi 38802-1220
(662) 842-7907 · Fax (662) 842-3873

Jackson, MS
Tupelo, MS
Gulfport, MS
Tampa, FL

www.phelpsdunbar.com

RACHEL M. PIERCE
Direct (662) 690-8176
piercer@phelps.com

March 28, 2003

17954.0001

**VIA MAIL and FACSIMILE**

Ms. Loretta Behm
Public Safety Officers' Benefits Program
810 Seventh St., N.W.
Washington, DC 20531

01-192

**Re: Estate of Harold Ray Presley**

Dear Ms. Behm:

Pursuant to our telephone conversation this morning, this letter is to inform you that I represent the estate of Sheriff Harold Ray Presley. As you and I have discussed, my client's position is that the payment of Sheriff Presley's death benefits should be made to the estate of Mary Christine Roberts. Mrs. Roberts was Sheriff Presley's mother and was qualified as an eligible beneficiary because although she subsequently passed away, she was alive at the time of his death and did survive her son. Accordingly, I respectfully request an oral hearing before a hearing officer pursuant to the procedures outlined in the Public Safety Officers' Benefits Hearing and Appeal Procedures.

If you have any questions regarding this correspondence or any other aspects of this case, please do not hesitate to contact me. In the meantime, I look forward to hearing from you, and I appreciate the assistance you have already provided.

Sincerely,

Rachel M. Pierce

Rachel M. Pierce

RMP:asv

TO:151225.1

16

**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

---

*Washington, D.C. 20531*

APR 0 4 2003

Phelps Dunbar L.L.P.
Counselors at Law
Rachel M. Pierce
201 South Spring Street
Seventh Floor
Tupelo, Mississippi 38804

Re: Sheriff Harold R. Presley; PSOB Claim No. 01-192

Dear Ms. Pierce:

This is to acknowledge receipt of your letter dated March 28, 2003, requesting that the Bureau of Justice Assistance reconsider its denial of the claim for death benefits. Specifically, you are appealing the denial of the claim for death benefits, pursuant to the Public Safety Officers' Benefits (PSOB) Act (42 U.S.C. 3796), as amended by Public Law 101-647.

The appeals are assigned in the order in which they are received. As soon as possible, a hearing officer will be assigned, and you will be notified. You will have significant latitude in scheduling a hearing date that meets your schedule. You will also have the option of requesting a record review and telephone depositions in lieu of a hearing, if you wish to expedite resolution of the appeal.

I hope this information is useful to you. If you need additional information, please contact this office at (202) 307-0635 or (888) 744-6513.

Sincerely,

Loretta Behm

Loretta Behm
Program Manager
Payments and Benefits Division

17

U.S. Department of Justice

Office of Justice Programs

*Bureau of Justice Assistance*

*Washington, D.C. 20531*

DEC 0 5 2003

Phelps Dunbar, LLP
Lawrence Magdovitz, Esq.
One Mississippi Plaza
201 South Spring Street, Seventh Floor
Tupelo, MS 38804

Re: Sheriff Harold Presley; PSOB Claim No. 2001-192

Dear Mr. Magdovitz:

This is in response to your letter regarding the appeal you filed for the Harold Presley family. Specifically, you are appealing the denial of the claim for death benefits submitted to the Bureau of Justice Assistance (BJA) pursuant to the Public Safety Officers' Benefits (PSOB) Act (42 U.S.C. 3796).

The appeal is now being assigned to Hearing Officer Mr. Frank Porpotage. You will be contacted by Mr. Porpotage to arrange a hearing date and location that is convenient for the Presley family.

Please be advised that the Bureau of Justice Assistance (BJA), Public Safety Officers' Benefits (PSOB) Office does not assume responsibility for costs incurred by a claimant in pursuing an appeal before this agency. It is, however, the responsibility of the PSOB program office to provide administrative support to the hearing officer. This includes arranging for and incurring the cost of a court reporter to attend the hearing and transcribe the testimony that is given.

I hope this information is useful to you. If you need additional assistance, please contact this office at (202)307-0635 or toll free 1-888-744-6513.

Sincerely,

Loretta Behm

Loretta Behm
Program Manager
Payments and Benefits Division

cc: Frank Porpotage
Hearing Officer

18

THE UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF JUSTICE PROGRAMS

BUREAU OF JUSTICE ASSISTANCE

IN RE:

SHERIFF HAROLD RAY PRESLEY

PSOB CLAIM # 01-192

_______________________________________/

APPELLATE HEARING

TAKEN FEBRUARY 19, 2004

HEARING REGARDING SHERIFF HAROLD RAY PRESLEY, taken before Marla Avery Minter, Certified Shorthand Reporter for the State of Mississippi at Large, in the Offices of Rachel Pierce, One Mississippi Plaza, 201 South Spring Street, Seventh Floor, Tupelo, Mississippi, on February 19, 2004, commencing at approximately 8:54 a.m.

APPEARANCES

HEARING OFFICER:
Honorable Frank Porpotage

FOR THE CLAIMANT:
Attorney Rachel Pierce
Attorney Bill Beasley

ALSO PRESENT:
Eva White
Larry Presley

EXAMINATION INDEX

BY THE HEARING OFFICER 4

EXHIBIT INDEX


| | |
|---|---|
| Exhibit A | 7 |
| Exhibit B | 7 |
| Exhibit C | 8 |
| Exhibit D | 10 |
| Exhibit E | 10 |
| Exhibit F | 11 |
| Exhibit G | 14 |
| Exhibit H | 15 |
| Exhibit I | 17 |
| CERTIFICATE OF REPORTER | 36 |


* * * * * * * * * *

MR. PORPOTAGE: This hearing before the Department of Justice is hereby called to order in Tupelo, Mississippi on February 19, 2004. The estate of Mrs. Christine Roberts and the Presley Family have asked for the hearing in order to request the agency to reconsider its determination that the estate of Mrs. Christine Roberts is ineligible to receive death benefits following the death of Sheriff Harold Ray Presley pursuant to the Public Safety Officers' Benefits Act (42 U.S.C. 3796) and its implementing regulations, 28 C.F.R. 32.

Specifically, the estate and family of Harold Ray Presley are appealing the decision to deny the claim for benefits because the decedent's mother, while considered an eligible beneficiary under the program, died before a PSOB claim was processed and awarded.

These aforementioned regulations implement the disability benefits pursuant to the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796), as amended by Public Law 101-647.

My name is Frank Porpotage and I am not an employee of the Public Safety Officers' Benefits

Office, the Bureau of Justice Assistance, or any other unit of the Department of Justice. I function as an independent hearing officer under a contract with BJA. As such, I have been delegated the authority to conduct this hearing. I may sign and issue subpoenas, administer oaths, examine witnesses, and receive evidence at any place in the United States I may designate. I will receive all relevant evidence the claimant chooses to submit. Neither the formal rules-of-evidence nor the Administrative Procedures Act applies to this proceeding.

After the hearing, the record will be transcribed. I will review the transcript, any evidence submitted at this hearing, and the agency case file. I will make my final determination in this matter no later than 30 days after I have received the final piece of information relevant to this proceeding. I will, at that time close the record and advise the attorneys handling the Roberts' estate of the date I expect to make my determination.

All persons should be aware that the Director of the Bureau of Justice Assistance may review and reverse my determination. If, for example, my

decision is to deny benefits, the claimant may ask the Director to review that decision. The Director will make the final agency determination within 30 days after your request. Other information pertaining to the appeals process is contained in the program regulations, a copy of which has already been provided to the attorneys present.

Let me remind you that this is an information session and I ask that you simply address me as Mr. Porpotage.

Are there any questions concerning the conduct of this hearing, or the appeals process in general?

(No response.)

MR. PORPOTAGE: Ms. Pierce, are you ready to present your evidence?

MS. PIERCE: I am.

MR. PORPOTAGE: Okay. Proceed.

For the record, I'm Rachel Pierce here along with Bill Beasley representing the estate of Christine Roberts. With us today are Larry Presley and Eva White, who are the son and daughter of the late Mrs. Roberts.

The factual background that gives rise to the reason we're here for this hearing today began on July 6, 2001, when Sheriff Harold Ray Presley was shot and killed in the line of duty. Sheriff Presley, as I'm sure you are aware, Mr. Porpotage, was chasing a kidnapping suspect here in Lee County when he was killed.

In support of that information, I would like to offer Exhibits A and B into evidence.

(Exhibits A and B, having been pre-marked for identification, were offered into evidence.)

MS. PIERCE: Exhibit A is the Certificate of Death of Harold Ray Presley. You can see that it is dated July 6, 2001.

Exhibit B is also the autopsy report of Sheriff Harold Ray Presley which merely confirms the date of death. And for the sake of the court reporter, these exhibits have been pre-marked as Exhibit A and Exhibit B.

Less than one month after Sheriff Presley's death, on July 19, 2001, the Public Safety Officers' Benefits Office initiated this claim for benefits with

regard to Sheriff Presley. And they did that by submitting a letter to Janet Burroughs. Ms. Burroughs was then an employee of the Lee County Sheriff's Department. For the sake of the record, I offer that letter dated July 19, 2001, into evidence as Exhibit C, and again this has been pre-marked.

(Exhibit C, having been pre-marked for identification, was offered into evidence.)

MS. PIERCE: That letter was titled the guidance letter, and what it did was merely outline what the family and what the beneficiaries of Sheriff Presley should do to pursue a claim for benefits.

In response to that letter, Ms. Burroughs submitted what's known as the *Death Benefits Questionnaire* to the Bureau of Justice Assistance. Ms. Burroughs, again an employee of the Lee County Sheriff's Department, completed that questionnaire which included questions about the cause of death of the officer who was killed in the line of duty as well as questions about the date, birth, and ages of all children of that officer and any surviving parents.

As you are aware, Sheriff Presley and his

wife were divorced, so his wife was not listed on this questionnaire as --

MR. PORPOTAGE: Ms. Pierce, let me interrupt you.

MS. PIERCE: Yes.

MR. PORPOTAGE: Since we're going to get into some procedural and time subsequences of documents, let me just point out to you that this actually preceded the guidance letter.

MS. PIERCE: I think, Mr. Porpotage, it's dated 7/16/01. I assume that the Justice Department received it on 7/19/01 because a letter of October 12 from Eric Martin states that that was the date this was received.

MR. PORPOTAGE: This says this is in response to the questionnaire.

MS. PIERCE: So perhaps they were exchanged on the same date. I believe this was faxed in. And, again, I'm just going by correspondence from the Justice Department that they say that was their date of receipt.

MR. PORPOTAGE: Okay.

MS. PIERCE: At any rate, this form listed

Mrs. Roberts, listed her Social Security number, her address, and noted that was she was a survivor of Sheriff Presley; and I've marked pre-marked that as Exhibit D and would offer that into evidence.

(Exhibit D, having been pre-marked for identification, was offered into evidence.)

MS. PIERCE: Shortly thereafter on September 7, 2001, Mrs. Roberts passed away; and for the benefit of this Court, I have pre-marked as Exhibit E the death certificate of Mary Christine Roberts, which as I stated is dated September 7, 2001, clearly after the death of Sheriff Harold Ray Presley.

(Exhibit E, having been pre-marked for identification, was offered into evidence.)

MS. PIERCE: The next correspondence in this case came on October 12, 2001. This came from Eric Martin. Eric is listed as a benefits specialist for the Public Safety Officers' Benefits Office. In that letter which Mr. Martin wrote to Janet Burroughs at the Lee County Sheriff's Department, Mr. Martin stated that Jada Presley would be the only eligible

beneficiary of Sheriff Presley's children.

Obviously, Brad and Patrick were above the age to be classified as children, and Jada would have been eligible had she been enrolled as a full-time student at an educational institution. Since she was not in school then she was not an eligible beneficiary. That would have made Mrs. Roberts, Sheriff Presley's mother, the only eligible beneficiary.

However, in this letter dated October 12, 2001, from Mr. Martin, Mr. Martin contends that because the Public Safety Officers' Benefits Program had recently learned that Mrs. Roberts had passed away he determined that Mrs. Roberts was not an eligible beneficiary and stated to Ms. Burroughs, again at the Lee County Sheriff's Department, that the claim would be closed if there were no eligible beneficiaries.

And I'll offer that into evidence as pre-marked Exhibit F.

(Exhibit F, having been pre-marked for identification, was offered into evidence.)

MS. PIERCE: At various times then in 2001

and 2002, there was some correspondence back and forth between attorneys for the estate of Mrs. Roberts and the Public Safety Officers' Benefits Program -- PSOB as it's usually referred to -- providing information relating to the claims of Sheriff Presley's estate.

MR. PORPOTAGE: Ms. Pierce.

MS. PIERCE: Yes.

MR. PORPOTAGE: Are you going to come back to these things, or shall I ask you questions as we proceed?

MS. PIERCE: Either way. Whatever is best for you.

MR. PORPOTAGE: Are you going to come back to these individually?

MS. PIERCE: I'll come back to them individually, or please feel free to interrupt me now and ask me questions if you would like to.

MR. PORPOTAGE: As you go through this time sequence, what is your next -- organizationally, how are you going to --

MS. PIERCE: Organizationally, I had planned to go ahead and introduce these into evidence and then come back to them in the phases of the argument, but

I'll be happy...

MR. PORPOTAGE: One quick question then, and I only ask quick questions.

There was no correspondence with the Presley family after the Janet Burroughs' letter of October 12th until this on July 2nd? There was no correspondence about this matter?

MS. PIERCE: There were some additional correspondences which I did not include. There were some letters back and forth providing additional information to the office. For example, I believe the autopsy report was a long time in coming from the state and that was submitted at one point by Ms. Burroughs.

Again, the toxicology report was submitted -- these were just simple cover letters saying, Enclosed please find the toxicology report which you requested, so just for the sake of brevity, I didn't include those; but there were some documents passing back and forth during this time.

MR. PORPOTAGE: All right.

MS. PIERCE: Again, at various times, like I said, during 2001 and 2002, some of those documents

passed back and fourth and then attorneys here in our offices at Phelps Dunbar began communication with Carol Winfield -- I think her name is actually Marion Carol Winfield -- again at the Bureau of Justice Assistance. With regards, that correspondence came with regards to the previous correspondence that had been received from Mr. Martin.

Our offices were explaining to Ms. Winfield the process that we had gone through in trying to get these benefits, and some of those letters are attached -- some of the more important ones, I believe, attached as Exhibit G.

That's a letter from the Larry Magdovitz here in our office to Ms. Winfield. Essentially that letter just explains how Sheriff Presley was, in fact, killed in the line of duty and then cites the pertinent C.F.R. regulations that apply to this claim, so I'll offer that into evidence as Exhibit G, which has already been pre-marked.

(Exhibit G, having been pre-marked for identification, was offered into evidence.)

MS. PIERCE: Following that letter to Ms.

Winfield, Mr. Magdovitz here in our office received correspondence from her that merely said, Enclosed please find Public Law 42 U.S.C. 3796, which as this Court is well aware is the Public Safety Officers' Benefit Act codified in the U.S. Code.

That letter from Ms. Winfield neither accepted the claim nor denied the claim. It simply said, Attached please find the statute. That would have been August 26, 2002, and has been pre-marked for the purposes of this hearing as Exhibit H and would be offered into evidence.

(Exhibit H, having been pre-marked for identification, was offered into evidence.)

MR. PORPOTAGE: Do you know what prompted this?

MS. PIERCE: I believe it was prompted by Exhibit G, which is the letter from Mr. Magdovitz to Ms. Winfield where he was explaining --

MR. PORPOTAGE: I feel like we're missing -- because they talk about all of these conversations going on.

MS. PIERCE: Well, there may have been some

telephone conversations which I was not privy to, but there's no correspondence in between. I believe that Mr. Magdovitz and Ms. Winfield were talking by telephone. I say that because I've seen his notes in the file that reflect telephone conversations with her, and then she says, "Pursuant to our telephone conversation," which I'm certainly not aware of what was discussed in that conversation. But at any rate, she submitted him the regulations that apply here today.

After that in December of 2002, what our offices received was the *Public Safety Officers' Benefits Act Claim Determination*. It's the formal determination and what turned out to be the formal denial of this claim.

In that document the three individuals with the Department of Justice -- Eric Martin, Michael Guerriere, and the person whose signature I can't read but who signed for the Office of General Counsel, all came to the determination that the claim for death benefits in this case should be denied.

The rationale behind that was, first, Jada Presley, the only child of Sheriff Harold Ray Presley

who was of the appropriate age to be considered a child under this statute, was not enrolled in a full-time educational institution and therefore she didn't qualify as a child pursuant to the terms of the statute.

The determination went on to decline to provide the benefits to Mrs. Roberts, who was Sheriff Presley's mother; and the basis for that denial was, first, that a formal claim had not been completed on behalf of Mrs. Roberts prior to her death.

(Exhibit I, having been pre-marked for identification, was offered into evidence.)

Secondly, in the last paragraph on what is Page 2 of pre-marked Exhibit I, you will notice that there is some discussion of the purpose of the PSOB program, and just reading directly from that document the officer stated that, "Moreover, even upon a formal

claim, no benefits would be awarded to Mrs. Roberts' estate because to do otherwise would be to subvert the very purpose of the PSOB Program."

-- and leaving out a little bit of the rest of that

paragraph.

For today's argument there are a couple of reasons why Mrs. Roberts' estate is entitled to these benefits. First of all, a plain reading of the statute of 42 U.S.C. 3796 makes clear that there are four categories of beneficiaries which Congress intended to receive these benefits.

As I'm sure this Court is well aware, those categories include surviving spouses, surviving children, and surviving parents. In the case at hand, there was no surviving spouse, and there were no surviving children who qualified pursuant to the terms of the statute.

(An off-the-record discussion was held.)

MS. PIERCE: As I said, there were no children who met the qualifications of a child as defined by this act. There was, however, Mrs. Christine Roberts who was a surviving parent at the time of Sheriff Presley's death. The only thing that this statute requires of a surviving parent is that they do just that, they survive the officer who is killed in the line of duty.

There is no further definition of the word "survivor." If we looked at Black's Law Dictionary, it simply means that you've outlived someone, that you have lived longer than they have.

The only requirement of this statute is that a claim be filed within one year of the death of the officer. Clearly in the case the claim had been initiated on July 19th, 2001, which was well within the one-year statute of limitations of the death of the officer who in this case was Sheriff Harold Ray Presley.

A clear reading of the statute says that Mrs. Roberts was entitled to the receipt of those funds. There's no further requirement in the statute that she survive her son for "x" number of months or for "x" number of years in order to receive these funds.

In fact, it's pretty clear that Congress went to great lengths to delineate exactly what person qualified as a child. In other words, they said a child had to be of a certain age. They said if a child was over 18 they had to be enrolled in an educational institution on a full-time basis. They took great steps to delineate that.

They didn't do the same thing with the surviving parent. They simply said that a parent has to survive, and in this case Mrs. Roberts did survive, her claim was submitted July 19, 2001, she met all of the qualifications, and so the fact that she died prior to receiving the benefit shouldn't then make her claim be denied.

MR. PORPOTAGE: You say that she did submit a claim?

MS. PIERCE: Her name was submitted on July 19, 2001, on the *Death Benefits Questionnaire*.

MR. PORPOTAGE: Oh, on the questionnaire.

MS. PIERCE: On the questionnaire. We admit that her formal claim was not completed prior to her death, but that was through no fault of her own.

As I'm sure you are aware, Mr. Porpotage, gathering documents like autopsy reports, like toxicology reports, takes time; and so this family was not able to get all of those documents prior to her death. And that simply wasn't their fault. They were waiting for folks like the State Crime Lab and the Lee County Sheriff's Department, so that delay was no fault of Mrs. Roberts; and certainly her family was

not aware that she would be passing away.

MR. PORPOTAGE: Right. But just to clarify, when you said she did submit a claim --

MS. PIERCE: Her name had been submitted. Her formal claim had not been completed. You are correct. But, again, the only requirement is that a formal claim be completed within a year, so she certainly was well within that year at the time of her passing, her time.

As to the Department of Justice's argument about the purpose of this act, there's a little line as I said in the benefits act claim determination that mentions that to pay Mrs. Roberts' estate now would be to subvert the purpose of the act. First of all, the United States Supreme Court has been pretty clear in cases like United States vs. Ron Pair, that if the statute is clear on its face, if the plain language of the statute is clear and unambiguous, we never look to the intent of Congress. We don't look to the purpose. We don't look to the legislative history. We merely read that statute as it's written.

Here I don't think there's a dispute about whether this statute is clear or not. It says the

benefits are due to a surviving parent, and Mrs. Roberts was in fact a surviving parent. So the argument that we should get into legislative intent or Congress' purpose is really a moot point in this case because we are not faced with an ambiguous statute.

MR. PORPOTAGE: I don't know if that's true because I think there was pretty strong support here in this legislation that says that it is for the economic benefit of survivors.

MS. PIERCE: There is definitely in my review of the legislative history a great deal of testimony from senators like the late Senator Thurmond, for example, who comment that this money is appropriated in fact to support survivors.

Our argument is that Mrs. Roberts was in fact a survivor, and the fact that she passed away prior to receiving the benefits doesn't make her any less of the survivor or any less entitled to the money that she was due.

Again, I just go back to those U.S. Supreme Court cases that say we don't look to Congressional intent unless there's ambiguity in the statute.

MR. PORPOTAGE: You want to get the citation

on the record?

MS. PIERCE: Yes, definitely. That's United States vs. Ron Pair.

For the benefit of the court reporter, it's R-O-N, P-A-I-R, Enterprises, Inc. That's cited at 489 U.S. 235, 240. And that's the leading Supreme Court case on statutory construction, and it's very clear that there's no need to explore the legislative history when the statute itself is clear.

In this case, there is no even additional defining of the surviving parents. And as I stated earlier, it seems pretty clear that had Congress wanted to limit what a surviving parent was they would have done that. They understood that they needed to limit what a surviving child was and what a surviving spouse was, so they certainly were aware of the need for some specificity and some delineation in those categories.

But, again, that sort of legislative history is really irrelevant to the case at hand when we are just faced with a plain reading of the statute. Sheriff Presley passed away on July 6, 2001. His mother survived him until September 7, 2001.

According to a plain reading of that statute, she was a surviving parent and so regardless of the timing of her death was entitled to receive the benefits which Congress had appropriated for her son.

MR. PORPOTAGE: Okay. Go ahead.

MS. PIERCE: Do you have any questions?

MR. PORPOTAGE: I just have a little problem with that, but I will take a look at everything you say. I've worked with this for about a year and a half, and this whole issue about eligible beneficiaries receiving some kind of economic security from these funds; and you are saying that, well, she still should get it. And I look and say, well, where is the economic security that would have been realized had she received the funds?

MS. PIERCE: I think she certainly would have realized economic security had she received the funds prior to her death. Our review of Mrs. Roberts' estate indicates that she was not a wealthy woman at the time of her death and certainly didn't have property or great resources so it would have been of great benefit to her. And it's certainly not her fault or the fault now of her families that she passed

away prior to the formal processing of her claim.

As far as the argument that leaving these funds, the funds that were allocated for Sheriff Presley, in the sort of "kitty," so to speak, to be distributed to other families, that's a fairly moot point since Congress has passed this statute and already allocated these funds. The funds have to be available to every single family when an officer is killed in the line of duty, and Mrs. Roberts was no different in this case.

The delay of governmental agencies and in processing autopsies or in preparing toxicology reports shouldn't unfairly have prejudiced her in receiving these death benefits.

MR. PORPOTAGE: Let's go back to that for a minute -- processing of those reports. When were those finished?

MS. PIERCE: I can look on my exhibits and tell you, but our State Crime Lab is a little bit notorious, I'm afraid, for being behind on that sort of documentations. Even though the autopsy itself would have been completed I believe the next day, the report was not finalized for several months

afterwards. It was after the passing of Mrs. Roberts.

MR. PORPOTAGE: For the record, could you read what that date is on that?

MS. PIERCE: Yes. This certified report, it appears for the record, of toxicology was not requested until 7/9/01, which would have been three days after the passing; and it appears that Ms. Burroughs in the Lee County Sheriff's Department did not then receive the copy of the report until August 29, 2001.

MR. PORPOTAGE: Okay.

MS. PIERCE: I'm looking to see if there's a separate date. At some points the autopsy reports come in either prior to or after the toxicology reports; and sometimes they are submitted separately.

MR. PORPOTAGE: Did Ms. Burroughs submit that to the government, or did someone in the family actually eventually submit that?

MS. PIERCE: It appears from our records that Ms. Burroughs received this then passed it along to the family; and we believe that Brad Presley, one of Sheriff Presley's children, then submitted that to the government. So Ms. Burroughs received it on

August 29th but didn't submit it immediately thereafter.

MR. PORPOTAGE: That's a shame because normally someone in the police department acts as a liaison between the Department of Justice and these matters.

MS. PIERCE: Exactly.

MR. PORPOTAGE: To pass that on to the family when they are grieving, it's unfortunate.

MS. PIERCE: Again, I think that just demonstrates how this estate shouldn't be prejudiced, you know, at a time when their family members were so upset and so traumatized over a death, the last thing they expected to have to handle was the submission of autopsy reports to a governmental agency. And certainly being aware that they had a year time frame to get this in, it wasn't one of their priorities at the time; and so the estate certainly shouldn't be prejudiced by the failure of the Sheriff's Department to submit that documentation.

And, again, I don't think that was anything intentional on the part of the Sheriff's Department. It was certainly, probably just a breakdown in

communication in getting those documents submitted.

MR. PORPOTAGE: I don't know if I agree with that, but proceed.

MS. PIERCE: At any rate, Mr. Porpotage, it's simply our position that this a clear statute -- it's unambiguous, it's clearly written, and it says that these death benefits are payable to surviving spouses, surviving children, and surviving parents.

In the case of Sheriff Harold Ray Presley here in Lee County, his eligible beneficiary was Christine H. Roberts, who was his mother. She was alive for three months after his death, and by anyone's definition, that constitutes survival.

According to the language of the statute, she was eligible for the benefits. Her name, Social Security number, and address had already been submitted to the agency. Any delay in processing additional documents certainly shouldn't be held against her or now against her estate.

Again, as to the argument about the purpose of this statute, when a statutory language is unambiguous, purpose is simply a moot discussion. However, Mrs. Roberts was exactly the sort of person

that this statute was designed to protect and help with economic benefits -- an elderly lady, living alone, who lost a child in the line of duty; and certainly those benefits would have been helpful to her financially had she received them prior to her death.

MR. PORPOTAGE: I want to ask you to reflect on that citation I sent you in the mail.

For the court reporter, I sent to Ms. Pierce a citation out of First Circuit Court of 1990, Hoffman vs. City of Warwick. In that decision it mentions the following: "Noncontractual employee benefits that a

recipient has not yet received but
has a mere expectation of receiving
are not property."

MS. PIERCE: Certainly. After a review of that case, I think it can be easily distinguished from the case at bar.

First of all, this case was one about due process, and there's no argument in the case at bar about due process.

For the sake of the record, this was a class-action case brought on behalf of several

employees in Rhode Island who felt that they were mistreated and deprived of due process when the Rhode Island legislature repealed a statute that would have offered them seniority in their employment because they were veterans. In that case the employees were suing because they felt like they didn't get their hearing and they felt like they didn't get their employee benefits.

However, as the Court noted, there have been lots of cases in Rhode Island prior to this where veterans were not receiving the proper benefits under the statute, even though the statute was in place; and then once it was repealed, they certainly weren't getting those benefits.

The veterans and veteran state employees and their lawyers argued then that they were deprived of their due process, and as this Court is well aware, any time the Supreme Court looks at a deprivation of due process, what they look to is was the individual deprived of a property, right, or a liberty interest. And if that's not the case, then there's no denial of due process.

In this case the Court did rule that

certainly no liberty interest was at stake, so that was irrelevant. And they ruled that the mere expectation of receiving those benefits was not a property interest.

In the case at bar as to Mrs. Roberts' estate, it's irrelevant whether there's a property interest because we're not alleging any sort of violation of due process. In this case this was merely a statutory right that has not been repealed. In fact, there's been even no discussion of repealing the statute. More importantly, I think the statute has been made a little bit stronger by the events of September 11th in that chaplains and fire fighters are now included as public safety officers, and as well they should be.

But again, the cases are completely diverse because there's been no repealing of the statute that we are discussing, 42 U.S.C. 3796; and then there's been no discussion of due process. Mrs. Roberts hasn't been denied any due process. In fact, we are having a hearing here today about her interests in this matter.

MR. PORPOTAGE: Are you saying that she has a

vested right to those benefits?

MS. PIERCE: I believe Mrs. Roberts had a vested right to those benefits the day her son passed away and the day she survived him when the only requirement of this statute is that she survive her son, and she did that. That was her only requirement, and then that a claim be submitted within a year; and that was certainly complied with.

It seems to me again that whether she did or didn't have a vested interest is not really the point in this case because in this case we are not talking about a due process violation. We're talking about a statutory right which Mrs. Roberts was entitled to and then didn't receive.

Again, I think the due process violation in the case you cite out of the First Circuit came more from the fact that the legislature repealed the statute without offering any sort of hearing to those people who benefited by the statute. And again, in the case at hand, 42 U.S.C. 3796 is alive and well and not being repealed, so there is no due process violation here.

MR. PORPOTAGE: Let's go back to the delays

in submitting the paperwork. If I understand the time frame of this, it's entirely possible that all of the paperwork could have gotten in with her having signed the claim and she could have gotten paid; is that correct?

MS. PIERCE: All the paperwork had arrived at the Lee County Sheriff's Department. What we don't know is exactly what time frame that paperwork could have been submitted. As I told you, the paperwork that we received last, that came in last, at the Sheriff's Department was that August 29th paperwork. That was very close to the date of death of September 7th. So it is highly unlikely that that information could have been then transported from the Lee County Sheriff's Department to the family and then to the Department of Justice or to the Public Safety Officers' Benefits.

MR. PORPOTAGE: Did you inquire as to why there was a delay of six weeks in getting the autopsy report?

MS. PIERCE: I did not inquire about that because having worked on a great many wrongful death cases with Doctor Hayne who does our autopsies, that's

just sort of commonplace. The problem is a staffing problem in the department and in getting these reports done. It's very common for them to come in that late. That's something that we didn't think was out of the ordinary, unfortunately. It may be in other states that they come in earlier but because of the volume of reports that have to be done and the minimal number of staff members, Doctor Hayne himself has told me that sometimes he'll have 23 or 24 autopsies in one day. It's possible for him to perform those autopsies. It's possible for him to dictate the reports. It's not possible for his staff to then transcribe those reports and for him to sign it and get them submitted.

MR. PORPOTAGE: Okay. Is there anything else you want to present to me?

MS. PIERCE: I think that's all at this time. We would just respectfully ask that Mrs. Roberts' estate be awarded the funds to which she's entitled because she did exactly as the statute required, she survived her son; and that's the only requirement that Congress set up because she outlived him, she is entitled to the benefits regardless of the date of her passing.

MR. PORPOTAGE: Okay.

MS. PIERCE: Do you have any further questions?

MR. PORPOTAGE: I have no further questions. I think I understand your argument quite clearly.

MS. PIERCE: Thank you.

THE COURT: Okay. If there's nothing else to be said, we'll close this hearing.

(The hearing ended at approximately 9:28 a.m.)

REPORTER'S CERTIFICATE

STATE OF MISSISSIPPI
LEE COUNTY

I, Marla Avery Minter, Certified Shorthand Reporter for the State of Mississippi at Large, hereby certify that on February 19, 2004, I reported the hearing regarding Sheriff Harold Ray Presley, and that Pages 4 through 35 contain a true and accurate transcription of the hearing by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 27th day of February, 2004.

MARLA AVERY MINTER, CSR, CMT
Certified Shorthand Reporter
for the State of
Mississippi at Large

EXHIBIT A

# STATE OF MISSISSIPPI

MISSISSIPPI STATE DEPARTMENT OF HEALTH
VITAL RECORDS

TYPE OR PRINT WITH BLACK INK

FILING DATE: JUL 1 1 2001

## CERTIFICATE OF DEATH
STATE OF MISSISSIPPI

STATE FILE NUMBER: 123-01-015294

**DECEASED**

| Field | Entry |
|---|---|
| 1. NAME (First, Middle, Last) | Harold Ray Presley |
| 2. SEX | Male |
| 3a. HOUR OF DEATH | 5:31 a.m. |
| 3b. DATE OF DEATH (Month, Day, Year) | July 6, 2001 |
| 4. RACE (Specify White, Black, American Indian, etc.) | White |
| 5a. AGE AT LAST BIRTHDAY | 52 Years |
| 5b. MOS / 5c. DAYS (ONLY IF UNDER 1 YEAR) | |
| 5d. HOURS / 5e. MINS (ONLY IF UNDER 1 DAY) | |
| 6. DATE OF BIRTH (Month, Day, Year) | Oct. 4, 1948 |
| 7a. COUNTY OF DEATH | Lee |
| 7b. CITY OR TOWN OF DEATH | Tupelo |
| 7c. HOSPITAL OR OTHER INSTITUTION-NAME AND NUMBER (If not in either, give street address, route number or other location) | North Mississippi Medical Center 41T |
| 7d. IF IN HOSP., OR INST. SPECIFY INPT., OUTPT., EMER. RM OR DOA | Emergency Room |
| 8. STATE OF BIRTH | Miss. |
| 9. DECEDENT'S EDUCATION (Specify only highest grade completed) Elem/High School (0-12) / College (1-4, 5+) | 12 |
| 10. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (Specify) | married |
| 11. SURVIVING SPOUSE (If wife, give maiden name) | Charlene McMullen |
| 12. WAS DECEASED EVER IN U.S. ARMED FORCES? (Yes or No) | Yes |
| 13. ORIGIN OR DESCENT (Specify Cuban, Afro-American, Mexican, etc.) | American |
| 14. SOCIAL SECURITY NUMBER | [redacted] |
| 15a. USUAL OCCUPATION (Kind of work done most of working life) | Sheriff |
| 15b. KIND OF BUSINESS OR INDUSTRY | Lee Co., Miss. |
| 16a. RESIDENCE—STATE | Miss. |
| 16b. COUNTY | Lee |
| 16c. CITY OR TOWN | Mooreville |
| 16d. INSIDE CITY LIMITS (Specify Yes or No) | No |
| 16e. STREET AND NUMBER OR RURAL LOCATION | 302 CR 1409 |

If death occurred in an institution, see HANDBOOK, regarding completion of RESIDENCE items

For RESIDENCE items, enter actual location of home rather than mailing address

**PARENTS**

| Field | Entry |
|---|---|
| 17. FATHER—NAME (First, Middle, Last) | Noah Edward Presley |
| 18. MOTHER—NAME (First, Middle, Maiden) | Christine Houston |

**INFORMANT**

| Field | Entry |
|---|---|
| 19a. INFORMANT—NAME (Type or print) | Charlene/Patrick, Brad/Jada Presley |
| 19b. MAILING ADDRESS (Street and number or route and box number, City or town, State, ZIP code) | [redacted] |

**DISPOSITION**

| Field | Entry |
|---|---|
| 20a. BURIAL, CREMATION, REMOVAL (Specify) | burial |
| 20b. CEMETERY, CREMATORY—NAME | Lee Memorial Park |
| 20c. LOCATION (City and State) | Verona, MS. |
| 21a. EMBALMER—SIGNATURE AND NUMBER | ▶ Steve Holland FB318 |
| 21b. FUNERAL HOME—NAME AND MISSISSIPPI I.D. NUMBER | Lee Memorial F. H. 41-L |
| 21c. MAILING ADDRESS (Street and number or route and box number, City or town, State, ZIP code) | P. O. Drawer 1220 Verona, MS. 38879 |

**PRONOUNCEMENT**

| Field | Entry |
|---|---|
| 22a. PERSON WHO PRONOUNCED DEATH—NAME AND TITLE (Type or print) | Roy Barnett |
| 22b. PRONOUNCED DEAD (Month, Day, Year) | ON 7-06-01 |
| 22c. PRONOUNCED DEAD (Hour) | AT 5:31A m. |

**CERTIFIER**

| Field | Entry |
|---|---|
| 23a. CERTIFIER—NAME (Type or print) | Roy Barnett |
| 23b. MAILING ADDRESS (Street and number or route and box number, City or town, State, ZIP code) | Post Office Box 185, Shannon, Mississippi 38868 |

This section to be completed by physician if NOT a medical examiner:

| Field | Entry |
|---|---|
| 24a. To the best of my knowledge, death occurred due to the cause(s) and manner as stated. SIGNATURE ▶ MD | |
| 24b. DATE SIGNED (Month, Day, Year) | |
| 24c. STATE LICENSE NUMBER | |
| 24d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or print) | |

This section to be completed by medical examiner ONLY:

| Field | Entry |
|---|---|
| 24e. On the basis of examination and/or investigation, in my opinion, death occurred due to the cause(s) and manner as stated. SIGNATURE ▶ | Roy Barnett, Jr. |
| 24f. TITLE | CMEI |
| 24g. DATE SIGNED (Month, Day, Year) | 7-06-01 |

Mississippi State Board of Health
Form No. 511
Revised 1-1-89

**CAUSE OF DEATH**

25. PART I. DEATH CAUSED BY:

| | Cause | Interval between onset and death |
|---|---|---|
| IMMEDIATE CAUSE (Enter one cause only): (a) | GSW to upper Body w/ Handgun | |
| DUE TO, OR AS A CONSEQUENCE OF (Enter one cause only): (b) | Inflicted by another Person | |
| DUE TO, OR AS A CONSEQUENCE OF (Enter one cause only): (c) | Sheriff in line of duty | |

Conditions, if any, which gave rise to immediate cause stating the underlying cause last

| Field | Entry |
|---|---|
| 26. PART II: OTHER SIGNIFICANT CONDITIONS—Conditions contributing to death but not resulting in the underlying cause given in PART I | |
| 27. AUTOPSY (Yes or No) | Yes |
| 28. WAS CASE REFERRED TO MEDICAL EXAMINER? (Yes or No) | Yes |

Had Decedent been Pregnant Within 90 Days Prior to Death? ☐ Yes ☐ No

Use if death NOT due to natural causes:

| Field | Entry |
|---|---|
| 29a. ACCIDENT, SUICIDE, HOMICIDE, PENDING INVESTIGATION, OR UNDETERMINED (Specify) | Homicide |
| 29b. DATE OF INJURY (Month, Day, Year) | 7-06-01 |
| 29c. HOUR OF INJURY | 4:00 Am. approx |
| 29d. DESCRIBE HOW OR BY WHAT MEANS INJURY OCCURRED | |
| 29e. INJURY AT WORK (Yes or No) | Yes |
| 29f. PLACE OF INJURY (Specify Home, Farm, Street, Factory, Office building, etc.) | Fellowship Rd. |
| 29g. LOCATION (Street or route number, City or town, State) | Saltillo, Ms. 38866 |

THIS IS TO CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT COPY OF THE CERTIFICATE ON FILE IN THIS OFFICE

F. E. Thompson Jr. MD
F. E. Thompson, Jr., M.D., M.P.H.
STATE HEALTH OFFICER

76

SEP -5 2001

Judy Moulder
Judy Moulder
STATE REGISTRAR

MISSISSIPPI STATE BOARD OF HEALTH

EXHIBIT
tabbies
A

WARNING: A REPRODUCTION OF THIS DOCUMENT RENDERS IT VOID AND INVALID. DO NOT ACC[EPT UNLESS] EMBOSSED SEAL OF THE MISSISSIPPI STATE BOARD OF HEALTH IS PRESENT. IT IS ILLEG[AL TO ALTER] OR COUNTERFEIT THIS DOCUMENT.

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER. THIS IS WATERMARKED PAPER. DO NOT ACCEPT WITHOUT [...] TO VERIFY WATERMARK.

EXHIBIT B

# REPORT OF POST MORTEM EXAMINATION

Steven T. Hayne, M.D., F.C.A.P.
350 Crossgates Blvd., Brandon, MS 39042
AME7-C3-01
Off: 601-824-8492

Decedent Harold Ray Presley Authorized by Roy Barnett, CMEI Lee County

Type of Death x Violent or Unnatural
___ Unattended by Physician
Sudden in apparent health
___ Unusual
___ In prison
Suspicious

RIGOR x Jaw x Arms
x Neck x Chest
x Back x Abdomen
x Legs

LIVOR
Color purple
___ Anterior x Posterior
___ Lateral
Regional fixed

Age 53 Race Cau Sex male Length 6'3" Weight 280 Eyes blue Pupils R0.9
Hair gray Beard no Mustache no Circumcised no Body Heat absent L0.9
Opacities, etc

BODY IDENTIFIED BY:

Clothes: 2 black socks/white briefs/gray, blk, and white shirt
Jewelry:
Valuables:
Other:
Serology:
Toxicology:
Trace Evidence:

* PERSONS PRESENT AT AUTOPSY:
* Prosector
* Jimmy Roberts, CMEI Rankin
* Victor Beckley, Diener
* Tommy Powell
* Two reps. Rankin Sheriff
* Dept.
* One rep. MS Hwy. Patrol
*
*

CAUSE OF DEATH: See section 15, A.
MANNER OF DEATH:

1. GENERAL:

The post mortem examination is requested by Roy Barnett, Coroner Medical Examiner/Investigator of Lee County. The request for the postmortem examination is made in that the decedent, Harold Ray Presley, died a violent death. The request for the postmortem examination is in compliance with the Coroner's Reorganization Act of 1986.

* ___ Provisional Report
* ✓ Final Report
*

2015 hours, 6 July 2001
Time and Date

Rankin County Morgue
Pearl, Mississippi
Place of Autopsy

Facts stated herein are true and correct to the best of my knowledge and belief:

Steven T. Hayne, M.D., F.C.A.P.
Anatomic, Forensic & Clinical Pathology
Deputy Coroner, Rankin County
Designated Pathologist,
Mississippi State Medical Examiner's Off.

EXHIBIT
B

The postmortem examination is conducted at the Rankin County Morgue in Pearl, Mississippi, at 2015 hours on 6 July 2001. The remains are identified as those of Harold Ray Presley by Coroner Medical Examiner/Investigator Roy Barnett. Individuals present and attending the postmortem examination include the prosector; Victor Beckley, Diener and Deputy Coroner Medical Examiner/Investigator of Hinds County; Jimmy Roberts, Director of the Rankin Medical Center, Director of Mississippi Mortuary Services, and Coroner Medical Examiner/Investigator of Rankin County; Tommy Powell, Mississippi Mortuary Services; two representatives of the Rankin Sheriff's Department; and one representative of the Mississippi Highway Patrol.

The decedent is a Caucasian male appearing the recorded age of 53 years. Clothing, valuables, and jewelry consists of two black socks, white briefs, and a gray, black, and white shirt which are removed prior to the internal and external examinations. The decedent is noted to measure 6 feet 3 inches in height and have an approximate body weight of 280 pounds. Well-developed rigor mortis is present and noted to involve the jaw, neck, back, legs, arms, chest, and abdomen. Fixed purple livor mortis is present over the posterior aspects of the remains. Body heat is absent and the decedent is not circumcised.

2. EXTERNAL EXAMINATION:

A. Gunshot Wounds: A total of six gunshot wounds are identified and will be discussed in section #3.

B. Head and Neck: Examination of the scalp reveals the scalp to be covered with gray hair. The decedent has neither a beard nor mustache. The eyes are blue, the sclerae are clear, and the pupils are fixed bilaterally at 0.9 cm. The dentition is in adequate repair. No remote injuries are identified to involve the head or neck. A 0.1-cm iatrogenic puncture site is identified over the right anterior surface of the neck and is covered with a 4 x 4 white gauze bandage and tape. No acute contusions, abrasions, or lacerations are identified to involve the head or neck. The facial bones are palpated and no fractures are identified.

C. Right Upper Extremity: Examination of the right arm, forearm, and hand reveals the presence of multiple scars identified over the posterior surface of the arm and forearm that individually measure up to 1 cm and extend to the dorsal surface of the hand. A gauze bandage is identified over the distal aspect of the arm, antecubital fossa, elbow, and proximal aspect of the forearm. The fingernails are intact and no tears to the fingernails are identified. No foreign tissue is identified underneath the fingernails. No gross evidence of powder residue is identified to involve the forearm, hand, and/or digits. No acute contusions, abrasions, or lacerations are identified to involve the extremity other than those associated with the gunshot

wound which will be discussed in section #3. The long bones are palpated and a fracture of the humerus is identified secondary to the gunshot wound which likewise will be discussed in section #3.

D. Left Upper Extremity: Examination of the left arm, forearm, and hand reveals the presence of multiple scars identified over the posterior surface of the arm and forearm that individually measure up to 1 cm. A medical identification band is affixed about the wrist. The fingernails are intact and no tears to the fingernails are identified. No foreign tissue is identified underneath the fingernails. No gross evidence of powder residue is identified to involve the forearm, hand, and/or digits. The gunshot wound of the forearm and the gunshot wound of the shoulder each will be discussed in section #3. The long bones are palpated and a fracture of the ulna is appreciated and will be discussed in section #3.

E. Right Lower Extremity: Examination of the right left and foot reveals the presence of multiple scars identified over the anterior surface of the knee and shin that measure up to 8 cm. A 6-cm linear scar is identified over the mid posterior surface of the thigh. No evidence of acute medical intervention is appreciated. A 4-cm contusion is identified over the anterolateral surface of the knee and a 1-cm abrasion is identified at the same site. The long bones are palpated and no fractures are identified.

F. Left Lower Extremity: Examination of the left leg and foot reveals the presence of multiple scars identified over the anterior surface of the knee and shin that measure up to 2 cm. Subacute abrasions are identified over the shin that measure individually up to 0.5 cm. No evidence of acute medical intervention is appreciated. No acute contusions, abrasions, or lacerations are identified to involve the extremity. The long bones are palpated and no fractures are identified.

G. Chest and Abdomen: Examination of the chest and abdomen reveals the presence of a 26-cm L-shaped scar coursing over the lateral left abdominal wall through the left flank and to the inferior left lateral surface of the back. The external genitalia are unremarkable. No evidence of acute medical intervention is appreciated. The gunshot wound of the abdomen will be discussed in section #3.

H. Back: Examination of the back reveals the presence of a 6-cm subacute contusion over the lateral left buttocks. The scar over the inferior left side of the back has previously been discussed. Two gunshot wounds are identified to involve the back and will be discussed in section #3.